[No. 21109. In Bank.—March 19, 1895.]

# THE PEOPLE, RESPONDENT, v. WILLIAM GIBSON AND CHARLES GIBSON, APPELLANTS.

CRIMINAL LAW — HOMICIDE — CONVICTION — CIRCUMSTANTIAL EVIDENCE — APPEAL.—Where the circumstantial evidence adduced upon a trial for murder in the first degree is persuasive of the guilt of the defendants charged with the murder, a verdict of conviction of the charge will not be disturbed upon appeal.

ID.—JOINT ACCUSATION—INSTRUCTION—CONSPIRACY—REASONABLE DOUBT AS TO GUILT OF EITHER DEFENDANT.—Where two defendants are jointly accused of the crime of murder, and the court has properly charged the jury upon the question of conspiracy between the defendants, an instruction that in order to find the defendant guilty of murder of the first degree, they must be convinced beyond a reasonable doubt that the defendants, "or either of them," unlawfully, or with malice aforethought, killed the deceased, does not, in effect, tell the jury that the claim of the prosecution as to conspiracy had been proved, or that without any proof of conspiracy one defendant could be convicted for the act of the other, but the jury were, in effect, told that if they should find that either one of the defendants committed the act, they could convict that one; and the jury could not be misled by the form of the charge.

ID.—VARIANCE IN INSTRUCTION—BILL OF EXCEPTIONS—JUDGMENT-ROLL.— Where an instruction appears in an erroneous form in the bill of exceptions and in a different form in the judgment-roll, which is not erroneous, the form of instruction as given in the judgment-roll will be taken as correct upon appeal.

ID.—INSTRUCTIONS, WHEN PART OF JUDGMENT-ROLL—BILL OF EXCEPTIONS.—Where instructions are properly authenticated by the judge they are a part of the judgment-roll, and do not properly belong in a bill of exceptions; and it is only where an oral charge is given and not otherwise authenticated, or modifications are made in written instructions which it is desired to show, that it is either necessary or proper to preserve instructions in a bill of exceptions.

ID.—INTENDMENTS IN FAVOR OF JUDGMENT.—All intendments of the law are in favor of the regularity of the judgment and proceedings of the court below, and it is incumbent upon the appellants to show error affirmatively.

ID.—EXCEPTION RESERVED BY LAW.—Exceptions to instructions in a criminal case need not be incorporated in a bill of exceptions; but the law preserves an exception to each instruction as fully as though stated in terms in the record, and the defendant has the same advantage of every objection to an erroneous instruction when properly authenticated in the judgment-roll, as when set out in a bill of exceptions and formal exception made.

ID.—INSTRUCTION AS TO MURDER IN THE FIRST DEGREE—ELEMENTS OF DELIBERATION AND PREMEDITATION.—Where the court has clearly and elaborately stated the law as to murder in the first degree, emphasizing that the intent to kill must be the result of deliberate premeditation, the

mere omission of the elements of deliberation and premeditation in one clause of the instructions, so as erroneously to convey the thought in that clause that if the killing was with malice aforethought, it would be murder in the first degree, is not prejudicial to the defendant, and could not tend to mislead or confuse the jury.

ID.—CHARGE CONSTRUED AS A WHOLE.—When the charge, taken as a whole, states the law with sufficient fullness and clearness, it is not ground of reversal that there are verbal inaccuracies in the charge, or that isolated sentences and phrases are open to just criticism; but it is sufficient that the charge, regarded in its entirety, shows no substantial error.

ID.—REVIEW UPON APPEAL—RULINGS NOT ARGUED IN BRIEF.—Where a large number of rulings are simply assigned in the brief of appellants' counsel, without suggestion of counsel's reasons for deeming them erroneous, they will not be dealt with by the court in detail, nor will the court seek for grounds of error to which its attention is not called.

ID. — EVIDENCE — PRIMARY CAUSE — MOTIVE — CIRCUMSTANCES PRECEDING HOMICIDE.—Evidence in reference to the working of a mining claim, and a misunderstanding arising between one of the defendants and the deceased and his brother respecting it, which occurred less than a week prior to the homicide, and which appeared to be the primary cause which led to the homicide, and constituted a link in the chain of circumstances pointing to the guilt of defendants, and tending to show their motive, is admissible in evidence, and is relevant and material to the issue; and, where it appears that the facts were subsequently communicated to and acted upon by the other defendant, such facts are admissible as against him.

ID.—DECLARATIONS SHOWING BAD BLOOD.—Statements made by one of the defendants during a difficulty at the mine which were communicated to the other defendant, and tended to establish the origin of bad blood between the parties, are admissible against both defendants.

ID.—EXPERT EVIDENCE—CHARACTER OF WOUND—DESCRIPTION.—One who is shown to have had experience in the observation and treatment of gunshot and other wounds on the frontier, against the Indians, and in the territories, although not a medical witness, may be permitted to testify as to the character of a wound found upon the body of the deceased, and the description of the wound by such witness is admissible as the statement of a fact.

APPEAL from a judgment of the Superior Court of Kern County.

The facts are stated in the opinion of the court.

*Carroll Cook,* and *Mahon & Laird,* for Appellants.

The evidence is circumstantial, and insufficient in law to sustain the verdict. (*People* v. *Lewis,* 36 Cal. 531; *People* v. *Hordissen,* 59 Cal. 403; *Miller* v. *Territory,* 3 Wash. Ter. 554; *Prather* v. *Commonwealth,* 85 Va. 122;

*Westbrook* v. *People,* 126 Ill. 81; *Raggio* v. *People,* 135 Ill. 533; *Floyd* v. *State,* 29 Tex. App. 349; *State* v. *Goodson,* 107 N. C. 798; *Warren* v. *State,* 30 Tex. App. 57; *Edwards* v. *State,* 2 Wash. 591; *Rose* v. *State,* 2 Wash. 310; *Ellis* v. *State,* 29 Tex. App. 413; *Tucker* v. *Commonwealth,* 88 Va. 20; *State* v. *Billings,* 81 Iowa, 99; *Mooney* v. *People,* 111 Ill. 388; *Lee* v. *State,* 76 Ga. 498; *State* v. *Brackville,* 106 N. C. 701; *People* v. *Curran* (Cal., Nov. 27, 1892), 31 Pac. Rep. 1116.) The court erred in permitting the witness Manning to state what, in his opinion, caused the wounds which he testified he found on the body of deceased. (Lawson on Expert and Opinion Evidence, 132, note 11; *Caleb* v. *State,* 39 Miss. 721; *Monk* v. *State,* 27 Tex. App. 450; *Goldstein* v. *Black,* 50 Cal. 464; *People* v. *Westlake,* 62 Cal. 309; *People* v. *Smith,* 93 Cal. 447; *People* v. *Lemperle,* 94 Cal. 46; Code Civ. Proc., sec. 1870, subd. 9.) The instructions assumed that one man could be convicted for the act of the other, and were misleading. (Pen. Code, sec. 31; *People* v. *Arnold,* 15 Cal. 482; *People* v. *Roberts,* 6 Cal. 214; *People* v. *Sanchez,* 24 Cal. 17; *People* v. *Honshell,* 10 Cal. 83; *People* v. *Byrnes,* 30 Cal. 206; *People* v. *Williams,* 32 Cal. 280, 43 Cal. 344; *People* v. *Atherton,* 51 Cal. 495; *People* v. *Valencia,* 43 Cal. 555; *People* v. *Anderson,* 44 Cal. 68; *People* v. *Campbell,* 30 Cal. 315; *People* v. *Wong Ah Ngow,* 54 Cal. 151; 35 Am. Rep. 69; *People* v. *Grigsby,* 62 Cal. 483; *People* v. *Guance,* 57 Cal. 154; *Barkley* v. *Copeland,* 86 Cal. 483; *People* v. *Edson,* 68 Cal. 549.)

*Attorney General William H. H. Hart,* and *Deputy Attorney General William H. Layson,* for Respondent.

The evidence of conspiracy and guilt is ample. (*People* v. *Bentley,* 75 Cal. 407; *People* v. *Dixon,* 94 Cal. 257; *People* v. *Collins,* 64 Cal. 293; Burrill on Circumstantial Evidence, 2d ed., pt. 2, c. 1, pp. 275, 278.) Manning was qualified as an expert, and could describe the wound. (*People* v. *Hawes,* 98 Cal. 648; *People* v. *Hong Ah Duck,* 61 Cal. 390.) The charge must be taken as a whole. (*People* v. *Etting,* 99 Cal. 577; *People* v. *Chun Heong,* 86 Cal. 331;

*People* v. *Bruggy*, 93 Cal. 486; *People* v. *Fernaghan*, 72
Cal. 612.)  The definition of murder was correct.  (*People*
v. *Bawden*, 90 Cal. 195; Pen. Code, sec. 187.)     Malice
imports deliberation.  (Pen. Code, sec. 7, subd. 4; *People*
v. *Vance*, 21 Cal. 400.)

VAN FLEET, J.—Defendants were convicted of murder
in the first degree in the killing of one Fletcher Burton,
and sentenced to the state prison for life.    They appeal
from the judgment and from an order denying them a
new trial.

Numerous errors are assigned.

1. It is first urged, and at considerable length, that
the evidence is insufficient to sustain the verdict.    It
will require but a statement of its salient features, we
think, to show that this contention is wholly without
merit.

The theory upon which the case was tried by the
prosecution was that the deceased was killed as a result
of a criminal conspiracy between the defendants.    The
evidence was largely, if not wholly, circumstantial, but
it tended to establish this state of facts:

The alleged homicide occurred on Sunday, the twenty-
seventh day of November, 1892, and was the result of
trouble between defendants and the Burton brothers
over a mining claim.    This mining claim had been dis-
covered earlier in the month of November by Charles
Gibson, one of the defendants, and David Burton, a
brother of the deceased, who had married a sister of the
defendants.    Shortly after the discovery of the mine,
and about ten days or so before the alleged killing,
David Burton and Charles Gibson met the deceased and
Luther Burton, another brother, and told them of the
discovery of the mining claim, and asked them to go in
and help develop or work the mine, and, as the Burtons
understood, have an interest in it.    With this under-
standing on their part, the deceased and Luther Burton
agreed to help work the mine, and, the following Sunday,
November 20th, they, in company with David Burton

and the defendant Charles, took their tools and utensils
and went to the mine. This mine or claim was some-
times called the Ross claim, but more frequently referred
to as the Undershot mine; it was situated in the hills
about four miles from the town of Kernville, and near
a cabin known as the Ross cabin. To reach the mine
from Kernville one traveled the main stage-road running
between Kernville and Caliente, to a point two or three
miles from Kernville, where a road forked off running
up into the hills, known as the Evans sawmill road;
following this latter road up for a distance of about two
or two and a half miles, and then turning up a trail
leading up a gulch for about three hundred yards, would
bring you to the Ross cabin; the mine was about two
hundred yards from the cabin, farther up the gulch.
The cabin was vacant at the time in question, and the
parties took possession of it and used it as a place in
which to cook and sleep while working in the mine.
Charles Gibson did not remain at the mine the Sunday
they went up, but, after leaving the tools and imple-
ments, returned with his team to his home in the valley,
a few miles distant; the three Burtons remained at
the mine, and, commencing Monday morning, worked
the claim during that week. Charles Gibson returned
to the mine on Tuesday and was told that they had dis-
covered good prospects. He went away, and returned
again on Thursday, and he then said that he thought
there had been a misunderstanding—that he did not un-
derstand that deceased and Luther Burton were to have
any interest in the mine. Some hot words were had be-
tween the defendant Charles and Luther Burton about the
matter, and the Burtons said they would quit rather than
have any trouble or quarreling over the mine; David
Burton, however, interposed and said that Charley did
not want them to quit, but after further controversy no
definite understanding was reached. Charles Gibson
then left the mine and went home, where, as it subse-
quently appeared, he told his brother William of what
had occurred; the next day (Friday) he returned

again, when further controversy over the mine occurred
between him and the Burtons.    On the afternoon or
evening of Saturday Luther Burton met the two defend-
ants in Kernville, and they did not seem disposed to be
friendly with him.    On the next morning (Sunday),
the twenty-seventh day of November, Luther Burton, in
company with a Mr. Robinson and his wife and a man
named Walker, left Kernville for Bakersfield in a wagon,
taking the stage-road leading from Kernville to Caliente;
about three miles south of Kernville they met William
and Charles Gibson riding in a buggy and leading a
saddlehorse; each had a rifle.    William Gibson indi-
cated to the party to stop, and, upon their coming to a
halt, he asked Luther Burton if he had recorded a mine
the day before.    Luther replied that he had not, where-
upon William Gibson said that he understood that he
had, and asked him where his brother Fletcher was.
On being told that Fletcher might have gone back to
the mine, he said they were going up to take him out of
that mine, and that they did not propose that Luther
should go and tell him that they were coming; he said
he was going to see that Luther went on to Bakers-
field, and did not go up where Fletcher was; that he
was going to see that his brother Charley was not rob-
bed out of that mine.    During the conversation, which
was of an angry and rancorous character, William Gib-
son became very much excited, and, jumping out of his
buggy, took one of the rifles and said to Luther Burton
that if he wanted to get out and take the other rifle they
would shoot the matter out right then and there.    Af-
ter some further controversy Luther and his party
drove on, and the defendant William Gibson thereupon
mounted the saddlehorse and followed them for some-
thing over a mile, until they came to David Burton's
place, where they stopped to talk with David Burton,
who had returned from the mine.    While at David Bur-
ton's William Gibson again declared that he was going
to see that Luther Burton went on to Bakersfield, and
did not go and tell Fletcher that they were going to take

him out of the mine.   Luther told him that he was go-
ing to Bakersfield, but that if they went up to the mine
to give his brother a square shake, and not try to sneak
up on him.    After further threatening language on the
part of William Gibson, Luther Burton and his party
continued on to Bakersfield.   This was about 9 or half
past 9 o'clock in the morning.

On that same morning, prior to meeting Luther Bur-
ton and his party, the defendants had been at the house
of David Burton, and they told David that they under-
stood that Luther Burton had recorded the mine the
day before in Kernville, and that they understood that
he and Fletcher intended to jump the mine; that they
understood that Luther was going to Bakersfield that
day, and William said they intended to meet the wagon
and "make Luke talk awful pretty that morning if he
got away."   At this time they each had a rifle, and they
drove away going towards Kernville.   Shortly after they
left, David Burton heard a shot and started up a ridge
to see what it meant, when the defendants caught sight
of him and came back, and asked him if he had started
up to tell Fletcher that they were going up after him;
and in a threatening manner the defendants informed
David Burton that he should not go up where Fletcher
was.   They then drove away.

About 2 o'clock in the afternoon of Sunday the defend-
ants came to the house of Mr. Walker, who lived on the
Kernville and Caliente stage-road, about three-quarters
of a mile from the Evans sawmill road, the defendants
were on horseback, and each had a rifle.   They left
Mr. Baker's place about half past 2 o'clock in the after-
noon, riding in the direction of the Evans sawmill
road; at this time a son of Mr. Walker's accompanied
them.   They rode to a point on the Caliente stage-
road, some distance beyond the Evans sawmill road,
and to a point where a road turned up to the house
of a Mr. Cochrane; here they were seen by Mr. Coch-
rane, and the son of Mr. Baker left them, and went
up to Mr. Cochrane's house and remained there for

some little time, when he left, about in time to reach home by dark. The defendants left young Walker at Cochrane's and went on. This, according to Cochrane, who was a witness for defendants, was between 3 and 4 o'clock. The defendants were next seen by David Burton that evening at about dark, riding on the Kernville and Caliente stage-road, between the forks of the Evans sawmill road and the house of Mr. Walker. At this time young Walker was again with them, but it did not appear where he met them, as neither defendants nor young Walker were put on the stand. They were about three hundred yards from the sawmill road, and about a quarter of a mile from Mr. Walker's, coming from the direction of the Evans sawmill road. They were then about two miles from the mine. They were on horseback, and each one had a rifle. David Burton at this time stopped them, and asked them if they had seen Fletcher, meaning his brother. William Gibson said they had not. David said to them he would like to know before he went home, and asked them if they had been to the mine; but William said they had not. He said he had not seen Fletcher that day. He said that "Fletch had not jumped the mine. He did not think he would hold it any way, and he did not think Fletch would jump the mine." At this time William had been drinking some. David Burton followed defendants back to Walker's, and again asked them if they had been to the mine. William Gibson said they had not. He said they had started up there, and went part way, but believed it would be too late before they got up; " that Ben Walker got afraid, and thought Fletch had jumped the mine and would be laying for them, and they would wait and go up in the morning." Charley Gibson, the other defendant, was present during this conversation, and he also said that they had not had any fuss with Fletcher, and that he had not seen him since Friday.

The body of Fletcher Burton was found that night, near morning, lying in the doorway of the Ross cabin. The trunk of the body was lying inside of the door, the

legs extending out through the door, and the deceased was on his back, with his left hand lying on the floor near a clay pipe. The head was lying in a large pool of blood, and blood was found scattered over the interior of the cabin. There were no arms upon his person, but a Henry rifle stood in a corner of the cabin, some ten feet distant. He had been shot through the head, the ball entering at the inner corner of the right eye near the nose, and coming out at the back of the head.

The defendants, it appeared, had been sleeping at the house of David Burton for some days prior to this time, but they did not return to David Burton's house on Sunday night, staying instead at Walker's. It further appeared that on Monday, after information had been received of the killing of Fletcher Burton, and the defendants had been informed of it by Mrs. Walker, they left the Walker premises, and were not seen again until the afternoon of the twenty-ninth day of November, when they appeared at the house of a Mr. Vaughn, in the neighborhood, and asked him to take them to Caliente to meet the sheriff. They told Vaughn they supposed the sheriff would be on the stage that day; that they had heard that Fletcher Burton had been shot, and that they were suspected of the deed, and they did not want to be arrested and taken back to Kernville; that they would rather take their chances at the county seat; that the protection would be better with the sheriff than to go to Kernville. At the time they came to Vaughn's house each of the defendants was armed with only a pistol, but, after Mr. Vaughn had started in a wagon to take them to Caliente, and they had gotten some little distance on the road, Charles Gibson got out and procured two rifles from a brush fence by the side of the roadway. One was a Winchester and the other a Colt's rifle. They told Mr. Vaughn that they had slept out the night before. They further said that they had had a dispute about the mine; that Fletcher Burton claimed that he had an interest in it, and Charley claimed that he had not; that Charley Gibson was alone at the mine

at the time of the dispute, and did not want to have much of a quarrel, and he had come down and told Will about it, and they had gone up to the mine.

It further appeared that the rifle which was carried by William Gibson on the Sunday in question was a Winchester, of the pattern known as a "40-65 caliber, model of '86." It also appeared that the cabin stood in a gulch facing and a few feet from the foot of a low rise, or hill, which sloped up a few feet from the door of the cabin; in coming up the trail from the point on the Evans sawmill road toward the cabin the trail divided a short distance below the cabin, one branch running up to the cabin and the other running up over the top of this hill before mentioned; bushes were growing on the slope of this hill, and there was a clump of bushes on a line between the top of the hill and the cabin door. An empty Winchester rifle shell was found at or near the top of this hill, at a point about thirty-six feet from the door of the cabin, and in line with the clump of bushes and the door of the cabin; this shell had stamped upon it " W. R. A. Co., W. C. F.," and the figures " 40-65." It also appeared that one standing at the point on the hill where this shell was found could look through this clump of bushes and see very distinctly the door of the cabin; and, upon investigation being made of this clump of bushes, a couple of branches showed evidence of having been nearly shot off by the passage of a bullet or bullets through the bushes. Immediately behind the deceased, upon the floor of the cabin, and in a line running from the top of the hill down through the cabin door, was found a deep furrow or abrasion upon the floor of the cabin, which the testimony tended to show was made by the glancing stroke of a bullet; and on one of the boards at the back end of the cabin, directly in line with the door, was found a like abrasion or dent. Upon the floor of the cabin were found two parts of a bullet which were much battered, and from their appearance had evidently come in contact with some hard substance, upon the larger piece of which there was

what appeared to be a piece of bone adhering. It further appeared that when the rifle carried by William Gibson was turned over to the sheriff it still had cartridges in the magazine; that one of them was removed and the shell found to correspond in the letters and stamp upon it and in size with the shell found at the scene of the homicide.

These are substantially the main facts gathered from the record, although there are other circumstances of a more or less incriminating nature appearing in the evidence, which we do not deem it necessary to take the space to mention.

So far from failing to sustain the verdict these facts which we have recited are, to our minds, very persuasive of the guilt of the defendants, and certainly are sufficient to preclude us from disturbing the verdict upon this ground.

2. Several of the instructions of the court are complained of.

The court, after properly defining murder, both of the first and second degrees, instructed the jury as follows:

" In order, therefore, to find the defendant guilty of murder of the first degree, you must be convinced, beyond a reasonable doubt, that the defendants, or either of them, unlawfully, and with malice aforethought, killed the deceased, Fletcher Burton, either by means of poison, or lying in wait, or by torture, or by some other kind of willful, deliberate, and premeditated killing, or in the perpetration, or in attempting to perpetrate, arson, rape, robbery, burglary, or mayhem. If you believe from the evidence, beyond a reasonable doubt, that the defendants, or either of them, unlawfully, and with malice aforethought, killed the said deceased, you will find them guilty of murder in the first degree; and if you believe from the evidence, and beyond all reasonable doubt, that such murder was perpetrated by any kind of willful, deliberate, and premeditated killing, it is murder of first degree, and you will so find. If the jury finds the defendants guilty of murder, the next question to be

determined is: Was the murder accompanied with a deliberate and clear intent to take life? In order to constitute murder in the first degree, that intent to kill must be the result of deliberate premeditation. It must be formed upon a pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation. There need be no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind. If the act of killing is preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer the killing is murder of the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.".

This instruction is attacked by appellants upon various grounds wherein they claim it does not correctly state the law. The first objection is directed to that particular part wherein the jury are told: "In order, therefore, to find the defendant guilty of murder of the first degree, you must be convinced beyond a reasonable doubt that the defendants, *or either of them,* unlawfully, and with malice aforethought, killed the deceased," etc. It is urged that the employment of the language above italicized, in the connection in which it is used, was to tell the jury, in effect, that the claim of the prosecution as to the conspiracy had been proved, and that, even without any proof of conspiracy, one defendant could be convicted for the act of the other. We do not so read the instruction, nor can it, in our judgment, be so regarded, without ignoring the context. The grammatical construction of this portion of the instruction in expressing what the court intended may be open to criticism, but the meaning of the court is plain. The court was informing the jury as to the circumstances under which the defendants, or either of them committing the act, could be convicted of murder in the first degree; and the effect of its language was to tell the jury that, if they should find that the two defendants

killed the deceased, under the circumstances indicated, they could convict them both; or, if they should find that *either one* of them committed the act, then they could convict *that one.* The defendants were being tried together, and the court was endeavoring to so frame its charge as to convey to the minds of the jury the fact that they could find a verdict against either one or both of the defendants on trial, as the circumstances should warrant. That this was the idea in the mind of the court and the meaning which would be conveyed to the mind of any jury of ordinary intelligence is, we think, manifest; and we think it equally plain that no jury could get the impression from this part of the instruction that the court, by its language, was assuming a conspiracy established, or even referring to that subject. Elsewhere the court charged the jury upon the question of conspiracy, and not only made plain to them the rights of the defendants upon that subject, but clearly charged them that the question as to whether a conspiracy had been established was one upon which they alone were competent to pass; and indicated very plainly that the court in no way intended to trench upon the province of the jury in that regard. Even assuming, therefore, that the language under criticism, taken by itself, might possibly be open to the construction sought to be put upon it by appellants, when read, as it must be, with the other parts of the charge upon the same subject, there is no chance that any erroneous impression as to the meaning of the court could have been left upon the minds of the jury.

Appellants also complain of that portion of the instruction which reads: "If you believe from the evidence, beyond a reasonable doubt, that the defendants, or either of them, unlawfully, and with malice aforethought, killed the said deceased, you will find *them* guilty of murder *of the first degree,*" etc.

It is first urged that this part of the instruction is open to the same objection made to that above discussed —that it assumes the conspiracy to be established.

The instructions, including the one from which the above excerpt is made, are found in the record in two places: they appear first, duly and regularly indorsed and authenticated, in the judgment-roll, and they are also found inserted in the bill of exceptions.   As found in the bill of exceptions that part of the instruction under consideration reads as above quoted; as it appears in the judgment-roll there is a difference, it there reading: "If you believe from the evidence, beyond a reasonable doubt, that the defendants, or either of them, unlawfully, and with malice aforethought, killed the said deceased, you will find *him* guilty of murder of the first degree," etc.—the difference being that the word "them," where italicized above, is used in the bill of exceptions in place of the word "him," as found in the judgment-roll.

If the instruction was given as it appears in the judgment-roll it is apparent that the objection is untenable, and is disposed of by what is said of the same objection to the first part—the jury being merely told that they could convict either or both of the defendants, as the evidence might warrant.

If, however, it was given as quoted above from the bill of exceptions, and this is the assumption of appellants, there is, perhaps, ground for objection that it assumes the conspiracy established, since the jury are, in effect, told that, if they find that defendants, or either of them, committed the act, then they can find *them* guilty; in other words, that if either one killed the deceased, they would both be equally guilty.   While it is very doubtful if the jury would so understand the language, in view of the other instructions given, we may assume for present purposes that they would, and that the charge in that form would be prejudicially erroneous.   The question then arises, how are we to know in which form this particular instruction was given to the jury?   In one form it is free from objection; in the other it is not.   At one point in the record we are told it was given in its unobjectionable form; at

another that, as given, it was erroneous. Both facts are certified to us in a manner importing equal verity. The recitals of the bill of exceptions in this regard are entitled to no greater consideration than those of the judgment-roll. In fact, if any intendments are to be indulged in favor of one over the other, they should run here in favor of the judgment-roll, since the instructions properly belong there, and do not belong in the bill of exceptions. It is only when an oral charge is given and not otherwise authenticated, or modifications are made in written instructions which it is desired to show, that it is either necessary or proper to preserve them in a bill of exceptions. Where the instructions are, as here, in writing and indorsed by the judge, they belong properly in the judgment-roll, and there alone. Here there is nothing to justify the inference that the instructions were incorporated in the bill of exceptions for the purpose of preserving any modifications, or to show that they were given to the jury in any different form from that in which they appear in the judgment-roll. In fact, a comparison shows that the one change above noted is the only difference disclosed between the entire charge as found in the bill of exceptions and as it appears in the judgment-roll. It is apparent, therefore, we think, that this discrepancy is the result of mistake, inadvertent or otherwise, but when the mistake occurred is not apparent. Under such circumstances we must apply the familiar principle that all intendments of the law are in favor of the regularity of the judgment and proceedings of the court below, and it is incumbent upon appellants to show error affirmatively. (*People* v. *Williams*, 45 Cal. 27.) This the record does not disclose, and we will presume that the instruction was given in the form which will go to sustain the judgment.

An observance of the plain dictates of the statute in making up the record would have avoided this confusion. These instructions, as we have indicated, had no proper place in the bill of exceptions; and yet they

would seem to have been inserted solely because of an idea that it was necessary in order to have them reviewed. This idea is erroneous. Under the law a defendant in a criminal case has the same advantage of every objection to an erroneous instruction when properly authenticated in the judgment-roll as when set out in a bill of exceptions and formal exception made. The law preserves the exception as fully as though stated in terms in the record. The repetition of instructions, therefore, in the bill of exceptions, except in the instances above adverted to, is wholly unnecessary, and only serves to encumber the record, and impose an aditional burden of expense upon the county which pays for the printing of the record.

It is further urged that the instruction is open to the objection that it ignores the necessary element of deliberation and premeditation in its definition of murder of the first degree. Taken by itself and there is no doubt but the language of that part last quoted is open to this criticism, since the jury are told that, if the killing was with malice aforethought, it would be murder *of the first degree.* This, of course, was erroneous, and the only question is, Was it an error which worked prejudice to the defendants? It is perfectly apparent from a reading of the whole instruction that the addition of the words " of the first degree" after the word "murder," in the connection in which they were used in the part of the instruction objected to, was a mere misprision, or a slip of the pen; and it is only those words which work the vice complained of. Both immediately before and immediately following this part of the instruction, and in the same connection, the learned judge very fully and correctly charged the jury as to the elements of murder in the first degree. In the preceding sentence the jury are told: " In order, therefore, to find the defendant guilty of murder of the first degree, you must be convinced, beyond a reasonable doubt, that the defendants, or either of them, unlawfully, and with malice aforethought, killed the deceased, Fletcher Burton, either

by means of poison, or lying in wait, or by torture, or by some other kind of *willful, deliberate,* and *premeditated* killing," etc.   And immediately following the objectionable language, and connected therewith by the conjunctive preposition, the jury are told: "If you believe from the evidence and beyond all reasonable doubt that such murder was perpetrated by any kind of *willful, deliberate,* and *premeditated* killing, it is murder *of the first degree,*" etc.   And again, in the next sentence: "If the jury finds the defendants guilty of murder, the next question to be determined is, Was the murder accompanied by a deliberate and clear intent to take life?   In order to constitute murder *in the first degree,* that intent to kill *must be the result of deliberate premeditation.*"

In view of this clear and elaborate statement of the law, in the same breath, as it were, with the erroneous language, it is hardly to be conceived that by this mere accidental lapse the jury were in any way misled.  Even if the objectionable words arrested their attention, which in all probability they did not, it would seem very improbable, indeed almost impossible under the circumstances, that they should give rise to any confusion in their minds.   In such a case we cannot presume injury to the defendant.   (*People* v. *Moore,* 8 Cal. 90.)

Several other instructions are assailed as not correct statements of the law, but we think the criticisms are without substantial merit, and some of them exceedingly hypercritical.   The instructions upon the question of alibi were clearly right; and those upon the subject of circumstantial evidence read together stated the law correctly to the jury.

In fact, taking the charge as a whole, while we cannot commend it as a model to be followed for brevity, conciseness, and freedom from verbal inaccuracies, we think that it stated the law sufficiently full and clear, and that it contains nothing of such prejudicial character as to warrant us in reversing the judgment.   Some isolated sentences and phrases are open to just criticism,

as is almost invariably the case when the court undertakes to charge the jury at great length; but, regarded in its entirety, we find nothing in the way of substantial error. (See *People* v. *Kernaghan*, 72 Cal. 612; *People* v. *Bruggy*, 93 Cal. 486; *People* v. *Chun Heong*, 86 Cal. 331.)

3. A large number of rulings of the court in admitting and excluding evidence are complained of, a few of which are specifically pointed out and presented, but by far the larger number of which are assigned in groups without suggestion of counsel's reasons for deeming them erroneous. We shall undertake to notice those of the former class that require it, but we cannot undertake to deal with the latter in detail, nor to seek for grounds of error to which our attention is not called. It is the duty of counsel to direct the court's particular attention to those matters which he regards of sufficient moment to affect the substantial rights of his client, and, in the absence of this, we feel at liberty to regard points not thus presented as mere make-weight of no real merit.

It was not error to admit in evidence the testimony of Luther and David Burton with reference to the working of the mining claim and the misunderstanding arising between the Burton boys, Luther and Fletcher, and the defendant Charles, in the absence of the defendant William Gibson. This difficulty occurred less than a week prior to the homicide, and was shown to have been the primary cause which led to it. It constituted a link in the chain of circumstances sought to be established by the prosecution pointing to the guilt of defendants, as tending to show motive, and was relevant and material to the issue. It was certainly admissible against the defendant Charles, and, it being subsequently shown to have been communicated to and acted on by William Gibson, was as clearly admissible against the latter.

For like considerations there was no error in permitting the prosecution to prove by the same witnesses the statements made by Charles during this difficulty at the mine. It was simply evidence of a transaction, thereafter communicated to the other defendant, tending to

establish the origin of the bad blood between the parties—a transaction avowedly, by William Gibson, made the basis of his subsequent conduct in the case. Under the circumstances shown it was admissible against both defendants.

The witness Manning, who discovered the body of the deceased, was permitted, against the objection of defendants that he was not an expert, to testify as to the character of the wound found upon the body, and this ruling is assigned as error. Assuming, as contended by appellants, that this was the subject properly of expert testimony, we are of opinion that the witness was sufficiently shown to be such. He was shown to have had experience, not only in the observation of, but treatment of, gunshot and other wounds on the frontier, against the Indians, and in the territories. We are not aware of any rule that requires experts in knowledge of this character to belong to the medical profession. It is not a class of knowledge which in its nature is so peculiarly confined to men educated in the science of medicine or surgery as to preclude its acquisition by others. We think the witness was shown to be competent. The testimony of the witness was, furthermore, more in the nature of a description of the wound than the opinion of an expert, and as such was clearly admissible as the statement of a fact. (*People* v. *Hong Ah Duck*, 61 Cal. 388.)

These are the only points requiring special notice.

We have carefully examined the other assignments, and find no material error in the record.

The judgment and order denying a new trial are affirmed.

McFarland, J., Garoutte, J., and Harrison, J., concurred.

Rehearing denied.