[Civ. No. 355.   Third Appellate District.—September 20, 1907.]

## DAVID S. PATTERSON, Appellant, v. ALBERT RUBENSTEIN, Respondent.

APPEAL—REVIEW—ASSIGNMENTS OF ERROR NOT ARGUED—WAIVER.—Assignments of error in the rejection of evidence not argued in appellant's brief will not be reviewed, but will be treated by the appellate court as waived.

CONTRACT FOR SALE OF LAND—ACTION FOR PURCHASE MONEY—DEFENSE—ABROGATION OF CONTRACT—NEW CONTRACT PERFORMED—SUPPORT OF FINDINGS AND JUDGMENT.—In an action to recover a balance alleged to be due to an alleged assignee of a contract for the sale

and purchase of land, where the answer pleaded an abrogation of the contract, and the substitution of a new contract, which was fully performed on defendant's part, and the court found for the defendant, upon sufficient evidence, except as to an immaterial finding, and the findings sustained by the evidence are sufficient to support the judgment for defendant, it will not be disturbed upon appeal.

APPEAL from a judgment of the Superior Court of Kings County, and from an order denying a new trial. M. L. Short, Judge.

The facts are stated in the opinion of the court.

J. F. Conroy, for Appellant.

M. E. Power, and R. J. Hudson, for Respondent.

CHIPMAN, P. J.—Action to recover the balance alleged to be due under a contract for the sale and purchase of land. The cause was tried by the court sitting without a jury, and defendant had judgment, from which and from the order denying his motion for a new trial plaintiff appeals.

Plaintiff claims as assignee of a certain contract executed January 27, 1905, by the Western Colonization and Investment Company, a corporation (hereinafter referred to as the company), and defendant. By this contract the company agrees to sell and defendant agrees to buy sections 21 and 34, T. 21 S., R. 20 E., M. D. B. & M., "at the price of ten ($10.00) dollars per acre, amounting in the aggregate to twelve thousand eight hundred ($12,800.00) dollars," upon the following conditions: Five hundred dollars on the execution of the contract and the balance "on or before ten days from the date of this contract." The company agreed to furnish defendant "within a reasonable time" an abstract "showing a title free and clear of all encumbrances"; the company also agreed to deliver to defendant "properly indorsed certificates of purchase for said sections 21 and 34 from the State of California." Receipt of the $500 is acknowledged by the contract, and it is agreed that if the company complies with its agreement and defendant fails to pay the balance agreed to be paid the $500 shall be forfeited, but otherwise if the company fails to furnish said properly

indorsed certificate. The contract is signed "Western Colonization and Investment Company, by D. S. Patterson (plaintiff) and Albert Rubenstein (defendant)."

It is alleged in the complaint that the company and plaintiff have "in all respects fully complied with the terms and conditions of said contract"; that on the day of its execution the company assigned said contract to plaintiff; that thereafter, at the request of defendant, to wit, on or about February 9, 1905, plaintiff tendered to defendant due assignment of said certificate of purchase, "together with an abstract of title to said sections, showing the title to said sections to be free and clear of all encumbrances; that thereafter, on the fourteenth day of March, 1905, said defendant paid on account of said lands and certificates the further sum of $8,960, and thereupon received from plaintiff the assignment of said certificate duly executed as aforesaid," and that there remains due and unpaid the sum of $3,340.

By his answer defendant denies specifically all the averments of the complaint, except the execution of the alleged contract; avers that on or about the month of March "and prior to the fourteenth day thereof," the contract mentioned in the complaint was "by mutual agreement of the parties, abrogated and annulled"; that "said land was on said date and for many years prior thereto had been embraced in Tulare Lake Reclamation District of said County of Kings, and was on said date, and for more than one year prior thereto had been, subject to a lien of $928.62 for moneys theretofore assessed against the same by said Levee District for reclamation purposes, which said lien had never been paid or discharged, and that on or about said last-mentioned date and after said agreement mentioned in said complaint had been abrogated and annulled, while said land was subject to said lien as aforesaid, said Western Colonization and Investment Company agreed to sell said land to said defendant and assign to him said certificates of purchase for the sum of $8,960.00 (the same being at the rate of seven dollars per acre for said land), provided the said defendant would assume the payment of said lien . . . , and said defendant then and there agreed to purchase said land for said sum and to assume the payment of said lien, and said defendant on or about the 16th day of March, 1905, paid said . . . company said sum of $8,960.00 in full for the purchase price of

said land and assumed said lien, and said . . . company
caused said certificates of purchase to be duly assigned and
transferred to said defendant, and said defendant then and
there became the legal owner and holder thereof and the legal
owner and holder of said land.''

Upon these issues the court found the following facts: That
the company and defendant entered into the contract pleaded
in the complaint; that on January 28, 1905, the company de-
livered to plaintiff a written assignment of said contract,
but that it was made by the company and received by plain-
tiff as security for the payment to plaintiff of $3,748.19 ad-
vanced by plaintiff to one George M. Perine for the benefit
of the company and at its request, and that defendant ''never
had any knowledge or notice of the fact that said assign-
ment was ever made or existed''; that at the making of said
contract defendant paid to the company through plaintiff,
''who was acting as the agent of said corporation for the pur-
pose of making said contract, said sum of $500; but neither
said corporation nor said plaintiff ever tendered or offered
said defendant any assignment of any certificate of purchase
for the land described in said contract for any part of said
land, with any abstract of title to said land, showing the title
to the same to be free and clear of all encumbrances, but, on
the contrary, said land was, at all the times mentioned in said
complaint, subject to a lien of $979.60 for taxes, assessed
against the same prior to the making of said contract by
Tulare Lake Reclamation District No. 749 . . . , within which
levee district said lands were and are situated, and at all said
times said land was also subject to a lien for state and county
taxes for the year 1904, amounting to $13.20, which lien at-
tached to said land, on the first Monday of March, 1904,
and neither of said liens has ever been paid or discharged
either in whole or in part''; that neither said company nor
plaintiff has complied with the terms of said contract, and de-
fendant has not failed or neglected to comply with any of
its terms and defendant is not indebted to plaintiff in any sum
of money. It is then found: That on or about March 7,
1905, the said contract was by mutual consent of the parties
thereto, and by and with the consent of plaintiff, abrogated
and annulled, and with plaintiff's consent the company en-
tered into a new contract of sale and purchase of said land sub-
stantially as averred in the answer; that at the same time

defendant paid to plaintiff the said sum of $3,748.19, "and plaintiff did at said time receive said last-named sum in full compensation for and in discharge of all his claims and demands secured by said assignment of said contract so set out in plaintiff's complaint as aforesaid." From these findings the court deduced the conclusions of law: That plaintiff is not entitled to recover anything from defendant and that defendant is entitled to judgment accordingly and for his costs.

The issues are very clearly stated in the pleadings, and with equal clearness the solution of the controversy is set out in the findings. Whether this solution of the learned trial judge is borne out by the record depends upon the facts established to the satisfaction of the court rather than upon any questions of law involved. Appellant's brief is devoted exclusively to a discussion of the evidence with the view of showing that the findings do not find support from the facts adduced. Appellant bases his argument in part upon evidence which was excluded by the court, in part upon conflicting testimony, and in part upon the assumption that the uncontradicted testimony of appellant, as a witness in his own behalf, must be given full credit here, although the trial court may have had cause to discredit, and may have discredited, his statements. Appellant has specified in his bill of exceptions twenty errors of law in excluding certain evidence, but in his brief he has not taken up these alleged errors, nor has he shown wherein there was error in the rulings, nor has he asked this court to pass upon them. It was said in *People* v. *McLean*, 135 Cal. 306, 309, [67 Pac. 770]: "It is due to this court from the members of the bar to point out clearly and concisely the rulings complained of as erroneous and the reasons why they are so, with reference to authorities, if any. In case counsel will not take the trouble to do so, we shall deem the matters as of not sufficient importance to merit notice in an opinion." (See *People* v. *Gibson*, 106 Cal. 458, 475, [39 Pac. 864]; *People* v. *Woon Tuck Wo*, 120 Cal. 294, 297, [52 Pac. 833].) The court will treat specifications of errors not commented upon in the brief of appellant as waived. We must, therefore, confine our review of the evidence to that which was admitted by the trial court, and in doing so must accept the facts and any just inferences from the facts which tend to sustain the findings.

It appears from an agreement introduced in evidence, dated November 23, 1904, in which W. H. O'Bryan, W. H. Townsend, Warren Wilson, W. I. Keese and the company were the first parties, and J. E. Viney and A. Rubenstein (defendant) copartners, were second parties, that on July 22, 1904, second parties entered into a contract to purchase from one George M. Perine certain several sections of land situated in Kings county, among them the two sections in question, and certain shares of the Lake Land, Canal and Irrigation Company; that second parties, on August 10, 1904, assigned this contract to a pool consisting of all the parties named in the contract of November 23d, except the company, in accordance with an agreement between themselves whereby they became associated "for the purchase of all said lands from said Geo. M. Perine, and for the sale thereof, at a profit to be divided between themselves"; that said members of said pool entered into an agreement on July 19, 1904, whereby they gave to the company "the exclusive right to handle said lands and to subdivide and sell the same for the said parties, at a profit and account to said parties therefor in the manner prescribed in said contract" of July 19, 1904; that said company sold all said lands except the lands in controversy, and as to which, while the company was still given the selling power, it was provided that, as to the unpaid balances on previous sales and the purchase money for the lands in question, "said Perine shall, upon the request in writing of the Western Colonization and Investment Company, execute and deliver a deed in accordance with the agreement heretofore made by him with Viney and Rubenstein, conveying upon O. J. Wigdal, of the city of Los Angeles, or upon the direction in writing of said Wigdal, to whomsoever said Wigdal may designate, sections twenty-one and thirty-four aforesaid" (land involved); that the company shall pay over to Wigdal all moneys remaining in the hands of Perine belonging to said pool and the money so received to be applied "first to the costs and expenses incurred by said Wigdal in the execution of the trust hereby created." This agreement further provided that Wigdal, as such trustee, should pay from the proceeds of sales certain stated amounts to members of the pool to make good their original investment, after which the remaining proceeds were to be disposed of by Trustee Wigdal as specifically provided, and the company was to receive as its share of the profits the water stock

above referred to. O'Bryan and Townsend, members of the pool, were also respectively president and secretary of the company. It will thus be seen that the company was made the selling agent of the property, Wigdal was trustee to carry out the transactions and the members of the pool were the principals or beneficiaries. On January 21, 1905, the company gave to plaintiff written authority for fifteen days "to negotiate a sale" of said sections, "for the price of eight dollars per acre in cash, to be paid upon the delivery of a deed to the purchaser for said property, or a certificate of purchase subject to reclamation assessments, if any." On January 27, 1905, a contract in writing was entered into for the sale and purchase of said land for the sum of $12,800, or $10 per acre; the contract purported to be between the company as first party and defendant as second party, and was signed, "The Western Colonization & Investment Company by D. S. Patterson, Albert Rubenstein." It was agreed therein that second party should pay $500 on the execution of the contract and the balance on or before ten days thereafter; that first party should furnish an abstract within a reasonable time "showing a title free and clear of all encumbrances"; that first party would deliver to second party "properly indorsed certificates of purchase for said sections." Plaintiff testified that he took the contract to Los Angeles and went with it to the office of the company and showed it to Mr. Townsend, the secretary, and that he made the indorsement appearing thereon which purported to be an assignment by the company "for value received" to plaintiff of all its interest in said contract, and is signed by the company by Townsend as secretary, attested by the corporate seal, and was subsequently, March 8, 1905, acknowledged by him as such secretary. Plaintiff testified that they (meaning the company) agreed to let him have the land for $7 per acre while assigning to him a contract made by the company for $10 per acre. Plaintiff also testified that the written authority of January 21, 1905, to sell the land for $8 per acre included $1 commission for selling. The assignment of the contract of January 27th bears no date, but witness thought it was executed on January 28, 1905. It further appeared from plaintiff's testimony that Perine held the certificates of purchase, and on February 7, 1905, they came to the Los Angeles National Bank with a draft attached for $3,748.19 and plaintiff paid the draft; that the certificates

were assigned to Wigdal, who made out assignments to plaintiff, and sent them with a draft attached for $5,211 to the First National Bank of Hanford for collection; that plaintiff and defendant examined the papers, and defendant said they were all right, but that his party to whom he had sold the land was not ready to take them up; that plaintiff thereupon executed assignments to defendant and left them with the bank with a draft attached for $12,300 ($500 of the purchase price having been paid); that defendant told plaintiff that he would pay the balance as soon as the party to whom he had sold paid him; that plaintiff's assignments to defendant remained in the bank for five or six days and plaintiff then ordered them returned and Wigdal ordered his to be returned to him, Wigdal, and that plaintiff received back his assignments on February 16, 1905. Plaintiff furnished an abstract of title to the land, but it disclosed an unpaid assessment of the reclamation district amounting to $979.60, and that section 34 had been sold to the state in June, 1904, for unpaid taxes, and that the taxes for the current year were unpaid. Defendant testified that he called attention to the condition of the title, and that he informed plaintiff that the persons to whom he had bargained the land had gone and that he could not hold them any longer and that if he "could pick them up again" he "would take the land, otherwise not." This conversation was on February 8, 1905. The testimony of Wigdal was that after the papers had been in the Hanford bank five or six days plaintiff called at the Home Savings Bank in Los Angeles, of which Wigdal was cashier, and "requested him to telegraph the Hanford bank to return the draft and the papers attached to it about February 15, 1905." The certificates of purchase and other documents were accordingly returned to Wigdal; the parties to whom defendant had expected to sell the land could not be "picked up again" and the transaction under the contract of January 27th seems to have been treated by all parties as at an end. Defendant met plaintiff at Los Angeles about March 7, 1905. He testified: "Mr. Patterson says, 'Well, you fell down on that deal.' I says—I explained to him that I didn't get the papers on time; I couldn't hold my people any longer and I can't handle it now." Some further conversation ensued as to a new deal between them, but nothing came of it and nothing was said by plaintiff about holding defendant to the contract. Wil-

son, a member of the pool, testified that three weeks before the ultimate sale of the land by the company to defendant, which occurred March 7, 1905, he met O'Bryan, president of the company and urged upon him the importance of effecting a sale; O'Bryan told him they thought a sale had been made to defendant but that it had fallen through "and the lands were now for sale to someone else." A week later he had another conversation with O'Bryan "along the same line, not different from the previous one; that the land was then unsold." At this conversation O'Bryan explained plaintiff's interest in the matter, which was that he had advanced money to meet the draft made by Perine "and they were having some trouble with Mr. Patterson (plaintiff). He wanted his money; he wanted it returned; that Mr. Rubenstein (defendant) had defaulted in his purchase and the company will have to return the money to Mr. Patterson, which they couldn't do until it was sold to someone else." On March 7th witness met defendant, who inquired "if the land was still for sale and in possession of the pool," and was told by witness that he so understood from the manager of the company, "who were agents for the sale of the land," that he, witness, was very desirous of selling the land himself for his own interest and would do what he could to further a sale. Defendant made an offer of $7 per acre, which witness expressed a willingness to accept, but said he was not the selling agent, "although authorized in a way to dispose of the land at a minimum price of seven dollars per acre." He said he would "go to the phone and get their authority to sell the land at seven dollars." Witness called up O'Bryan, president of the company, and told him the land was for sale at $7, and that a purchaser "was in the bank at that moment who wished to purchase the land; he had his money ready to pay for it." O'Bryan "stated that Mr. Wigdal should be called to the phone and that he be authorized to receive the money in payment of the land there; that was acted upon; I called Mr. Wigdal to the phone and he entered into a conversation with Mr. O'Bryan." Defendant was present at the time and heard the conversation, which was to the effect that Mr. Wigdal "was authorized to receive the money in payment of the land" at the rate of $7 per acre, defendant to assume the assessment charges on the land. Witness Wigdal testified to his conversation by telephone with O'Bryan substantially

as stated by witness Wilson. He further testified that plaintiff and Mr. Conroy, who was plaintiff's attorney, and was also attorney for the company, came to him and left with him the Perine draft, which plaintiff had taken up, and instructed him to send the draft with the certificates of purchase to the Hanford bank; that he had instructions from the company in writing as to the disposition to be made of the money to be paid by defendant. He testified: "Mr. Patterson was to receive his money back, the $3,748.19. Nothing was said about his receiving any other money. I believe Mr. Conroy said to me to hold those certificates until Mr. Patterson got his money; they were assigned to him. The conversation was in Mr. Patterson's presence." He testified that he paid plaintiff $3,748.19 and disbursed other money paid him according to instructions received, and that he received no instructions from the company nor from defendant to collect any amount of money on the sale "in excess of seven dollars an acre." Referring to the disposition made by him of the $8,960, the purchase price of the land, paid by defendant, witness testified: "Mr. Patterson made no objection to my disposition of the money as stated; Mr. Conroy acting for him made no objection to it. I never told Mr. Patterson nor Mr. Conroy the name of the person to whom the sale was to be made. I told them a sale would be made. I did not state the amount of the sale." It appeared that to close the final sale to defendant it became necessary for plaintiff to make an assignment of the certificates of purchase to defendant, as Wigdal had previously executed an assignment to plaintiff, when the first deal was made, and, as he testified, it was "to perfect the chain of indorsements" to defendant that he required of plaintiff an assignment to defendant. Plaintiff complied with Wigdal's demand for the assignment, but made no claim for any money beyond his advance in payment of the Perine draft. It was an undisputed fact in the case that defendant had no knowledge that the company, through O'Bryan and Townsend, had assigned to plaintiff all interest it had in the contract of January 27th between the company and defendant. Defendant supposed that when his transaction under that contract was terminated, or treated as abandoned, the company could sell the land and he dealt with it accordingly, and as he had no knowledge that the company had assigned the contract to plaintiff it seems to us he had

6 Cal. App.—29

a right to assume that the contract of January 27th was no longer in force, but was, as the court found, "by the mutual consent of the parties abrogated and annulled."

The evidence shows that plaintiff, and his attorney who was assisting him in the matter, knew that the company was making a sale of the property on March 7th, and that it was a new and different sale from that made to defendant by the contract of January 27th; plaintiff at no time informed defendant that he held that contract by assignment; plaintiff had signed the company's name, not his own, as the selling party to the contract; his original authority was "to negotiate a sale"; defendant was a member of the pool and knew, as did plaintiff, that the company also had the power to make the sale and that Wigdal was trustee to execute it; the only anxiety shown by plaintiff in the matter was to get the money he had advanced to pay the Perine draft; he made assignments to defendant at Wigdal's request without making any claim beyond this amount. These facts tend strongly to support the findings of the court. There is evidence tending to show that plaintiff was acting as agent of the company in making the contract of January 27th, and was to receive a commission. The subsequent action of Townsend, as secretary of the company, in assigning it without any apparent consideration to plaintiff, thus depriving the beneficiaries of the pool, for whom the company was acting, and toward whom it was bound to act in entire good faith, of several thousand dollars, was, to say the least of it, a colorable transaction. It is not surprising that plaintiff failed to disclose it when the second sale was being concluded or to insist upon his alleged rights under it, and that neither O'Bryan nor Townsend was called as a witness to explain it.

The court found that the assignment made to plaintiff on January 28th was made by the corporation and received by plaintiff to secure to plaintiff the payment of the Perine draft. The evidence was that this draft was drawn upon Wigdal and was taken up by plaintiff, but it does not clearly appear at what dates the draft was made and paid. We infer that plaintiff paid this draft after the contract was entered into and after it was assigned to plaintiff, and if this be true, it can hardly be true that the assignment was made to secure a payment made at a later date than the assignment itself. However this may be, we do not deem it material, for

the transaction came to naught and plaintiff was repaid his advance and the original contract of sale was abrogated, and, so far as appears, plaintiff retained the $500 paid on this contract by defendant. The finding not being material, plaintiff is not prejudiced, though it is not supported by the evidence.

So far as we can discover from the evidence admitted by the court, the material findings are warranted and support the judgment.

The judgment and order are, therefore, affirmed.

Hart, J., and Burnett, J., concurred.