[Crim. No. 938. In Bank.—May 27, 1903.]

## THE PEOPLE, Respondent, v. ROBERT E. GLAZE, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—IMPEACHMENT—COPY OF STEN-
OGRAPHER'S NOTES—REFUSAL TO ORDER PRODUCTION.—A typewritten
copy of the notes of a stenographer taken at the time of an oral
statement made by a witness for the prosecution upon a charge of
murder, when taken to the police headquarters immediately after the
homicide, which copy was never exhibited to the witness or assented
to by him, directly or indirectly, as a correct copy of his oral
declarations, could not be used against the witness for purposes of
impeachment, and it was not error for the court to refuse to order
its production on motion of defendant's counsel.

ID.—ADMISSION OF EVIDENCE.—The admission of immaterial evidence
could not prejudice the defendant. Evidence tending, in connection
with other evidence, to show the exact time of the homicide was
competent and was properly admitted.

ID.—REBUTTAL—INTOXICATION OF DEFENDANT'S WIFE.—Where evidence
had been adduced by the defense to show that the deceased had on
the day before the shooting called the wife of the defendant a
drunken woman and had insulted and abused her, and that she had
asked her husband to demand an apology from the deceased, it was
proper in rebuttal to show that the wife of the defendant was in
fact intoxicated, and that the defendant knew that fact.

ID.—TRIVIAL ERROR IN REBUTTAL.—Where the verdict was guilty of
murder in the first degree, with imprisonment for life, a trivial error
in rebutting evidence in reference to a remote provocation which
could not have reduced the offense cannot be ground for reversal.

ID.—REBUTTING PROOF OF THREATS.—Where the prosecution had pro-
duced no proof of the threats of the defendant in chief, and the
defense had produced evidence of quarrels between him and the de-
ceased, and of threats made by the deceased against the defendant,
it was proper to allow the prosecution in rebuttal to give evidence
of threats and ill-feeling by the defendant against the deceased.

ID.—REBUTTING TESTIMONY FOR IMPEACHMENT.—It was proper to allow
a witness for the prosecution to testify in rebuttal as to statements
made by a witness for the defendant inconsistent with his testimony,
and for which the proper foundation had been laid upon his cross-
examination.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—CROSS-EXAMINATION OF WIT-
NESS—ARGUMENT.—It was not misconduct for the prosecuting at-
torney to ask a witness for the defense if he had not made a certain
statement contrary to his evidence which included bad language,

nor to ask further questions, to which objections were sustained, in the absence of any showing of bad faith in the cross-examination; nor was it misconduct in argument to denounce the motives of the defendant and to endeavor to show that he was a cold-blooded murderer, where there was evidence tending to show him guilty.

ID.—ARGUMENT—RESTRICTION OF COMMENT—FAILURE OF PROSECUTION TO PRODUCE WITNESSES—WAIVER OF ERROR.—Where nothing is cited from the record to show that witnesses not produced by the prosecution had knowledge of any fact material to the case, and the sentence is to imprisonment for life, the question of error is deemed waived, and the court will not search the record to ascertain whether such witnesses could have been produced or could have testified to any material fact.

INSTRUCTIONS—REQUESTS—MATTER OF FACT—MALICE.—A requested instruction involving a matter of fact was properly refused, though it might have been harmless if given. Where the jury were properly instructed as to the elements of each offense included in the crime charged, if the defendant desired a more elaborate definition of malice given to the jury, he should have requested a special instruction upon that subject.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Frank H. Dunne, Judge.

The facts are stated in the opinion of the court.

W. W. Foote, Edgar D. Peixotto, and Frank J. Murphy, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, Lewis F. Byington, District Attorney, and J. Charles Jones, for Respondent.

SHAW, J.—The defendant was charged in the court below with the murder of one William Trewella, alleged to have been committed on the fourteenth day of January, 1901. Upon the trial he was convicted of murder in the first degree, and his punishment fixed at life imprisonment. He moved for a new trial, and upon the motion being denied he appealed from the judgment and from the order denying his motion for a new trial. A brief statement of the facts will facilitate an understanding of the points involved.

The prosecution gave evidence tending to show that the defendant and the deceased Trewella were partners in the

business of conducting the Windsor Hotel in San Francisco; that shortly before the homicide John H. O'Connor, the bellboy, had received from Sachs, the occupant of room 70, an order for a drink, which required a lime or lemon in its preparation, and had delivered the order to Calisher, the bartender, who said that he had no limes or lemons at the bar; that O'Connor then went to the kitchen, where the deceased Trewella was at the time, and told him the limes were needed; that Trewella started toward the bakery as if to get the limes; that just as he was entering the bakery he met the defendant, who then shot him four or five times with a pistol, and thereby killed him. There was no evidence in the opening of the case of any previous threats by the defendant, or of any facts showing pre-existing hatred or bad feeling, by the defendant toward the deceased.

The defendant in his defense admitted the homicide, and rested solely on the plea of self-defense. On his behalf evidence was given of divers threats by the deceased against the defendant, made to the defendant personally and to others who communicated them to him, and also of declarations by the deceased showing bad feeling toward the defendant. The defendant and his wife also testified that the day before the shooting she told the defendant that a few moments before she had gone with her daughter, Edith Shelley, to the room occupied by Trewella and his wife to inquire about a key and some linen; that there, in the presence of Mrs. Trewella, Emma Williams, mother of Mrs. Trewella, and Edith Shelley, daughter of Mrs. Glaze, Trewella had grasped her, Mrs. Glaze, by the shoulder and arms, had shaken her violently, torn her clothing, called her a drunken woman, told her to go to bed, and otherwise insulted and abused her, and that she then asked her husband to immediately demand of Trewella an apology for his conduct; but the defendant refused, saying that Trewella was excited, that they had better let it drop, that he had too much at stake to quarrel with Trewella, and that by the next day he (Trewella) would probably apologize of his own accord. The evidence on this point was not limited to a statement of the facts communicated by the wife of the defendant to him. Instead of doing this, or, rather, as a method of doing it, the defense began this portion of the case by caus-

ing Mrs. Glaze to relate the history of the affair with Trewella, and, after relating all this matter, to testify that she went crying upstairs to her own room, where she found her husband reading; that he was astonished and asked what had occurred, and she then "told him what had happened in Mr. Trewella's room." The words quoted comprised her entire statement as to what she told her husband; but it must be assumed from this testimony that she related to him everything to which she had previously testified with respect to the difficulty. Her daughter, Edith Shelley, was also put upon the stand and gave testimony to the same affair in detail.

As cause for reversal, the defendant assigns divers errors alleged to have occurred at the trial, which were duly excepted to. We will consider them in their order.

1. The bell-boy, O'Connor, testified that he was an eye-witness to a part at least of the homicide, and related the circumstances. On cross-examination it was disclosed that immediately after the homicide he was taken to the police headquarters and there made a statement to Captain Seymour, which was taken down at the time. The defense then demanded that the district attorney produce the statement referred to by the witness; whereupon the district attorney admitted that he had such a statement in typewriting, but refused to produce it. Application was then made to the court for an order requiring its production, but the court refused to make the order.

The statement could not have been used in evidence, except for the purpose of impeaching the witness, by showing thereby that he had made statements out of court inconsistent with the testimony given by him on the trial. (Code Civ. Proc., sec. 2052.) The only statements that can be used for that purpose, if in writing, are statements made by the witness himself, either directly in his handwriting or over his signature, or indirectly by his adoption of, or admission of, the correctness of a written report of his statements made by some other person. He cannot be held responsible for a statement taken down by another purporting to be a report of his oral declarations, unless he has been made acquainted with the contents of such statement, and directly or indirectly admitted that it was correct. Inquiry as to the admissibility of such statements

and as to the necessity of ordering their production is addressed to the court. Unless it is shown that there is good reason to believe that the document when produced would be admissible in evidence for some purpose in the case, the court need not compel its production. (*Ex parte Clarke,* 126 Cal. 235.[1]) There was testimony with relation to this statement from which the court could rightly conclude that the oral statements of the witness to Captain Seymour were taken down in shorthand by a stenographer, and afterwards written out in longhand, and that the document in the possession of the district attorney, and which he refused to produce, was the longhand typewritten copy of the shorthand notes. There was nothing to show that the witness had ever read the statement or seen it, or that he was aware of its contents. This being the case, the statement could not be used for purposes of impeachment, as a statement made by the witness, and it was not error to refuse to compel its production.

2. It is urged that the witnesses Sachs and Calisher should not have been allowed to testify to the facts related by them. Sachs testified that he was the occupant of room 70, and that he rang the bell and gave to O'Connor an order for a drink a few minutes before the shooting. This was probably immaterial, and certainly could not be injurious to the defendant. The witness Calisher testified that he was the barkeeper, and that he received an order from O'Connor for a drink, told him to get some limes to mix it with, and that O'Connor then went out of the saloon, and that this was immediately before the shooting. This was proper and competent evidence in connection with the other evidence given, for the purpose of showing the exact time of the homicide.

3. Defendant claims that certain acts of the district attorney constituted such misconduct as to require a reversal. Samuel Meyers, a witness for the defense, testified to certain threats made by the deceased against the defendant. On cross-examination he was asked by the district attorney if he had not at another time stated to one McMahon that he did not know anything about the case, "and would not commit perjury for any —— of a ——." Counsel had a right to put before the witness the entire statement claimed to have been made by him.

[1] 77 Am. St. Rep. 176.

The fact that it imputed to the witness the use of bad language, in the absence of any showing of bad faith or ulterior purpose on the part of the district attorney, did not constitute misconduct.

The testimony of this witness as to the threats was in these words: "He, Trewella, says, 'I see you have trouble with your partner,' and I told him that I did have trouble, and he said at the time he was having trouble with Mr. Glaze, and unless he got his money from the son of a bitch he would kill him." On cross-examination the district attorney asked Meyers this question: "Was not the trouble with your partner owing to the fact that you had stolen some sheep from Mr. Cammays?" And after stating that he had gone to his sister's house after getting out of the hospital, he was asked the question: "Were you served with papers in a divorce proceeding while you were in there?" Objections were sustained to these questions, and they were not answered. Upon the argument the district attorney used this language with reference to the defendant: "When this foul fiend from hell sent Trewella to his Maker, the motive came from a heart as black as the crime committed." All this is complained of as misconduct on the part of the district attorney of such grave character that it prevented defendant from having a fair trial. We do not think there is a sufficient showing of injury from these questions and remarks to justify a reversal of the case. The jury must be presumed to have intelligence enough to know that mere questions do not constitute evidence. The district attorney did not persist in this line of examination in either instance, but stopped immediately upon the objection being sustained. There is nothing to indicate that they were put in bad faith for the purpose of discrediting the witness by the suggestions contained in the questions. It is entirely probable that the district attorney at the moment and in the heat of the trial believed that the question as to the trouble between the witness and his partner was proper. As to the question concerning the divorce paper, there is nothing to indicate that it was in the least tending to degrade the witness. The remarks in the course of the argument to the jury did not go beyond the limits of a proper argument. The district attorney was endeavoring to show that the defendant was a cold-blooded mur-

derer.  The evidence tended to show that he was guilty.  If he was guilty, he certainly deserved the denunciation complained of.  A defendant on trial for murder is not entitled as of right to be spoken of as if he were an innocent man in an argument by the officer who is endeavoring to show that the evidence proves his guilt.

4. Objections were made to the testimony of several witnesses called in rebuttal, upon the ground that the evidence sought to be elicited was irrelevant, immaterial, incompetent, or not rebuttal.  The offer of most of this testimony was occasioned by the peculiar method adopted by the defense to prove the declaration made to the defendant by his wife, as hereinbefore stated, relating to the conduct of the deceased toward the wife on the day before the homicide.  The most evident purpose for which these statements to the defendant by his wife could be material was to show some sort of provocation for the shooting of the deceased the next day.  It is doubtful if it was not too remote in time even for this purpose, but as the defendant offered it and there was no objection, it may be conceded that it was material.  The gist of the testimony was, that the deceased had called the wife a drunken woman, and had treated her roughly, using violence upon her person.  It appeared that this occurred but a few minutes before the wife related the facts to the defendant.  If at the time the insulting language was used by the deceased, the wife was in fact intoxicated, and the defendant knew she was so intoxicated, these facts were material to be shown in rebuttal, for it is manifest that a false accusation of that character should justly anger the husband much more than a truthful one.  If she were so intoxicated at the time the deceased made the accusation as to attract notice to her condition, she could not have been sober when she told her husband about it a few minutes afterwards, and the jury would have a right to infer that her husband was aware of her condition, and knew that it was a truthful charge.

Mrs. Trewella and her mother, Mrs. Williams, who was blind, were allowed to testify to the circumstances of the quarrel over the objections of the defendant.  Some details were given which were entirely immaterial, but they were not injurious.  (*People* v. *Worthington,* 115 Cal. 246.)  If material, the evidence was, of course, properly ad-

mitted. The only part of the testimony that could have been injurious, if it were immaterial, was so much of it as disclosed circumstances tending to show that Mrs. Glaze was drunk at the time of the difficulty. So far as it tended to prove this fact, it was, as above stated, material and proper rebuttal, and' there was no error in allowing it for that purpose. The trial court seems to have supposed that the fact that she was intoxicated was not material, or that opinion evidence to the fact was incompetent, and therefore struck out the direct testimony of these witnesses to that fact. The mistake of the court below in this respect does not establish the law of the case, and need not be further considered here.

Edith Shelley, the daughter of defendant's wife, testified on behalf of defendant to the circumstances of this difficulty. On cross-examination she was asked if, after the occurrence, she had not told one of the chambermaids that on that occasion her mother, Mrs. Glaze, went into Mrs. Trewella's room and that she, Edith, had a hard time to get her mother out of the room. An objection by the defense was sustained, and no answer was made. In rebuttal, over the defendant's objection that no foundation had been laid for an impeaching question, the prosecution was allowed to prove by Tillie Wilson, a chambermaid, that Edith Shelley had said that "she had gone to Mrs. Trewella's room that night, and she had a very hard time to get Mrs. Glaze out." It was technically an error to allow this evidence, in the face of the objection that the proper foundation had not been laid for its introduction. (Code Civ. Proc., sec. 2052.) But it does not follow that its admission is such serious error as to demand a reversal. Possibly Edith Shelley could have explained the remark; probably she would have denied making it. The objection of the defendant prevented her from doing either, and defendant's counsel did not recall her and have her admit, explain, or deny it, if she could, which they could easily have done. The testimony was on a point collateral to the homicide, and of doubtful materiality in any event. It only tended remotely and inferentially to prove that Edith Shelley did not testify truly in saying that her mother was not intoxicated, and the fact of intoxication was itself of exceedingly slight importance and remote bearing on the real question, which was the frame of mind of the defendant the next day at the time he shot Trewella. The

feeling that might be produced the day before was material only in so far as it could be considered to linger in the mind of defendant until the next day, and then constitute some sort of provocation for, or palliation of, the shooting, from which the jury might be induced to hold the defendant guilty of a crime less than murder of the first degree, or might be induced not to inflict the death penalty. There was much other testimony on the same subject. The death penalty was not imposed. The provocation here sought to be established could not have had the effect of reducing the offense to manslaughter. It was too remote from the time of the shooting to have such effect. Under these circumstances this trivial error should not be held sufficient to require reversal. (Pen. Code, sec. 1258; *People* v. *Collins,* 75 Cal. 412; *People* v. *Clark,* 106 Cal. 37; *People* v. *Brotherton,* 47 Cal. 404; *People* v. *Nelson,* 85 Cal. 425, 429; *People* v. *Chuck,* 78 Cal. 317; *People* v. *Chang,* 74 Cal. 389; *People* v. *Wynn,* 133 Cal. 72; *People* v. *Barthleman,* 120 Cal. 15.)

One F. M. Black was allowed to testify to certain statements made by the defendant to him shortly before the shooting, tending to show ill-feeling on the part of the defendant towards Trewella, and also to a threat made by the defendant against Trewella, that he would get him (Trewella) out of the house or have his hide. The defense had gone very fully into the previous relations of the two parties concerned, including evidence of repeated quarrels between them, and of threats by the deceased to injure and kill the defendant. The prosecution had not touched this subject in its opening. In this state of the case, under the rule laid down in *People* v. *Dennis,* 39 Cal. 634, it was proper to allow the prosecution in rebuttal to give evidence of threats and ill-feeling by the defendant against the deceased.

There was no objection at all to the testimony of the witness Haake, called in rebuttal, and the objections to the testimony of Heney were all sustained. The witness McMahon was properly allowed to testify in rebuttal as to statements made by him to the defendant's witness Meyers inconsistent with Meyers's testimony on the trial, and for which the proper foundation had been laid.

5. On the argument counsel for the defendant were not allowed to comment on the failure of the prosecution to call

as witnesses two persons named Cody and Kendall. The defendant's counsel did not, either in the briefs or in the oral argument, point out or cite any part of the transcript of three hundred and forty printed pages wherein it appears that either of these witnesses had knowledge of any fact material to the case. If they had not such knowledge there was no error in the action of the court, although it is always hazardous for the court to restrict the arguments of counsel on such points. The risk of error is necessarily great, owing to the weakness of human memory as to the facts. But counsel simply refer to the page of the record where the ruling and exception is noted, and restate the objection in seven lines of their brief, and cite, by book and page only, five cases to the general proposition that evidence in the power of a party to produce may be presumed to be adverse if not produced. Under the circumstances a long line of decisions holds that the error, if any there be, is deemed to be waived, and that this court will not search the record to ascertain whether or not Cody or Kendall could have been produced as witnesses, and whether or not, if produced, they, or either of them, could have testified to any material fact that was in dispute. (*People* v. *Wo,* 120 Cal. 297; *People* v. *Gibson,* 106 Cal. 475; *People* v. *Daniels,* 105 Cal. 264; *Wheelock* v. *Godfrey,* 100 Cal. 589; *Neylan* v. *Green,* 82 Cal. 128; *West* v. *Crawford,* 80 Cal. 33; *People* v. *Busby,* 113 Cal. 181; *Tapscott* v. *Lyon,* 103 Cal. 297; *Riverside Water Co.* v. *Gage,* 108 Cal. 240.) The only exception to this rule is, that where the death penalty is imposed this court has said that it will examine the record for error, although no argument is made on behalf of the defendant. (*People* v. *Clark,* 121 Cal. 634.) The exception does not obtain in cases of imprisonment for life. (*People* v. *Busby,* 113 Cal. 181.)

Such examination of the record as we have made in the course of the investigation of the other points made satisfies us that the guilt of the defendant was fairly established by competent evidence. We have seen nothing to indicate that either Cody or Kendall knew any disputed fact of sufficient importance to warrant a reversal on account of this action of the court.

6. The court refused to give the following instruction asked by the defense: "If the evidence fails to show any motive to

commit the crime charged on the part of the accused, this is a circumstance in favor of his innocence, and should be considered.'' The constitution declares that ''Judges shall not charge juries with respect to matters of fact.'' (Art. VI, sec. 19.) A statement to the jury that the failure to prove the existence of a motive impelling the defendant to commit the crime is a ''circumstance in favor of his innocence,'' while perhaps a correct statement of the view to be taken by the jury of such failure of proof, is nevertheless an instruction with respect to a matter of fact. As such, the court was not bound to give it. While an instruction of this character may be, and usually is, harmless if given, it is not error to refuse it.

The defense also complains that the court did not in its instructions give to the jury any definition of malice, and insists that the substance at least of the definition given in section 188 of the Penal Code should have been stated in the instructions. The jury were properly instructed as to all the elements of the several crimes,—of murder of the first degree, murder of the second degree, and manslaughter,—and were correctly informed as to which of these crimes includes malice as a necessary element. If the defendant desired a more elaborate definition of the word, he should have requested a special instruction on the subject. The jury are presumed to understand words in ordinary use in the English language, and the court was no more bound under the circumstances of this case, of its own motion, to define for them the meaning of the word ''malice,'' than it was to give a definition of any other word used in the statutory description of the crime of murder.

The refusal to give other instructions asked by the defense is assigned as error, but an examination of the instructions given by the court shows that the instructions refused, so far as they were correct in law, were all included in those given.

There being no material error apparent in the record, the order and judgment are affirmed.

Angellotti, J., McFarland, J., Van Dyke, J., Lorigan, J., and Henshaw, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.