Argued January 5, affirmed February 8, 1921.

## STATE v. YEE GUCK.

(195 Pac. 363.)

**Witnesses—Public Officer may Waive Privilege not to be Examined as to Communications Made to Him.**

1. ` A public officer may waive the privilege granted him by Section 733, Or. L., to refuse to be examined as to communications made to him in official confidence when the public interest would suffer by the disclosure, and, by offering the whole document containing the communications for the jury's consideration in a criminal case, such exemption was waived.

**Witnesses—Defendant may Compel Production of Evidentiary Paper by Subpoena Duces Tecum.**

2. Defendant in a criminal prosecution may compel the production of an evidentiary paper by a *subpoena duces tecum* served upon the individual having custody of it.

**Criminal Law—Discovery cannot be Used as a Mere Exploring Expedition.**

3. The power of court under Section 533, Or. L., to order a party to give the other permission to take a copy of any book or document is clearly discretionary, the language ,not being mandatory, and the paper or document must contain evidence of matters relating to the merits of the action or suit before the court, even in its discretion, can compel an inspection thereof by the adverse party, since discovery cannot be used as a mere exploring expedition.

**Criminal Law—Witnesses—Transcript of Statements Made to Prosecuting Attorney by Witnesses not Admissible—Use of Transcript for Impeachment.**

4. A transcript of statements made by witnesses to prosecuting attorney, not signed, was hearsay, and admissible for no other purpose than to impeach the witnesses by asking if they had made declarations on that occasion inconsistent with their testimony at

---

2. Issuance of *subpoena duces tecum*, see note in 128 Am. St. Rep. 756.

the trial, and even in such case the paper would not be competent in itself to impeach them, as the stenographer who heard the statements would have to be called.

### Criminal Law—Prosecutor not Compelled to Produce Transcript not Used by Witness to Refresh Recollection.

5. Court did not err in refusing to compel district attorney to produce the transcript of statements of witnesses made to him, under Section 859, Or. L., requiring production of writing used to refresh recollection, where the witnesses at the time of the trial, retaining independent recollection, did not use the writing, and there being no evidentiary value attached to it.

### Criminal Law—Declarations of Conspirators After Commission of Object Inadmissible.

6. It is error to admit the declarations of co-conspirators made after the commission of the object of the conspiracy.

### Criminal Law—Evidence of Flight of Co-conspirator After Killing Held Admissible.

7. In a prosecution for homicide, court did not err in admitting evidence of a short flight of a co-conspirator and his arrest and return to the place where decedent fell, as a part of the res gestae; it being important to identify all of the participants in the homicide, in pursuance of which it was admissible to allow witnesses who saw codefendant engaged in the killing to show that he was kept in their view during the pursuit and capture, so that he could be identified by them as a participant in the killing.

### Homicide—Self-defense must be in Proportion to Danger; Instruction as to Defense of Another Held Insufficient.

8. Self-defense is merely a preventive remedy and must not be out of proportion to the real or apparent danger, and in a homicide case court did not err in refusing to instruct that "If the defendant honestly believed and circumstances were such that a reasonably prudent man would have been led to such belief, that the life of his companion was in danger at the hands of" the deceased, "or his associates, then he had the right to take such measures as were in his power to prevent the commission of such crime, even though it would lead to the death of" deceased; such instruction leaving out imminence of danger, under Sections 1908, 1909, Or. L.

### Homicide—Self-defense cannot be Turned into Instrument of Reprisal.

9. Self-defense cannot be turned into an instrument of vengeance or reprisal, and when the danger has passed or ceased to be imminent the right to kill in resistance ceases, under Sections 1908, 1909, Or. L.

### Criminal Law—No Reversals for Errors not Affecting Substantial Rights.

10. Under Section 1626, Or. L., a conviction will not be reversed for technical errors, defects or exceptions which do not affect the substantial rights of the accused.

---

8. Law of self-defense, see note in 74 Am. St. Rep. 717.

From Multnomah: ROBERT TUCKER, Judge.

Department 1.

Yee Guck, the defendant, with others, was indicted in Multnomah County for the crime of murder in the second degree committed by killing Chin Hong. Having been tried separately from his codefendants, he was convicted, and, being aggrieved at the result appeals.　　　　　　　　　　　　　　AFFIRMED.

For appellant there was a brief over the names of *Mr. John F. Logan* and *Messrs. Winter & Maguire,* with oral arguments by *Mr. Robert F. Maguire* and *Mr. Logan.*

For the State there was a brief over the names of *Mr. Walter H. Evans,* District Attorney, *Mr. Dan J. Malarkey,* Special Prosecutor, *Mr. George Mowrey,* Deputy District Attorney, and *Mr. Samuel H. Pierce,* Deputy District Attorney, with oral arguments by *Mr. Mowrey, Mr. Malarkey* and *Mr. Pierce.*

BURNETT, C. J.—The affray resulting in the death of the deceased was part of a tong war between rival Chinese factions and was staged in the streets surrounding a city block in Portland bounded on the south by Flanders Street, on the east by Sixth, on the north by Glisan, and on the west by Broadway. According to the story of the defendant, he and one of his codefendants known as Shee Fong were walking west on Flanders Street when they came to the northeast corner of the intersection of Flanders and Sixth Streets. About that time they saw members of a rival Chinese tong on the opposite side of the street. The defendant here claims that those on the west side of Sixth Street began firing at him and his

companion, Shee Fong. They immediately returned
the fire, and during the ensuing fusillade they crossed
Sixth Street, where the defendant stopped and re-
loaded his pistol. He claims that at that moment he
saw his companion, Shee Fong, running north on the
west side of Sixth Street, pursued by the decedent,
and he himself immediately took up the pursuit of
the deceased to prevent him from hurting Shee Fong.
The three, according to his story, ran in that order
west on the south side of Glisan Street, Shee Fong
in the lead, pursued by the decedent, and Yee Guck
bringing up the rear. He claims that the deceased
was shooting at Shee Fong. The race continued to
Broadway, where there was a street-car standing.
According to the defendant's story, his companion,
Shee Fong, ran to the right and west of the street-
car, while the decedent turned to the left or east of
the car and ran south on Broadway. From the
street-car, south, the decedent was running away
from the two defendants, Yee Guck and Shee Fong,
but they continued in pursuit of him, shooting at him
until they arrived at the southwest corner of the in-
tersection of Broadway and Flanders Streets, where
the decedent fell dead.

There was testimony given to the effect that imme-
diately afterwards Yee Guck ran west a short dis-
tance on Flanders Street, but was arrested by a police
officer about thirty feet away from the body of Chin
Hong, and that his codefendant, Shee Fong, fled north
on Broadway, retracing his steps, until he came to
Glisan Street, turned west to West Park Street, and
thence north, and was captured by a pursuing crowd
of white men and brought back to where the police-
man had Yee Guck in custody, all within a few min-
utes. It is also in evidence that several Chinamen

were engaged in the fusillade on Sixth Street near Flanders, but that only the three mentioned joined in the race west on Glisan Street and thence south on Broadway to the spot where Chin Hong fell.

At the trial the state called Mr. and Mrs. Libby, husband and wife, who were eye-witnesses of the death of Chin Hong, and they described the occurrence and the actions of the defendant. On cross-examination it was developed that these witnesses had been interviewed by the district attorney, whose stenographer took notes of their statements and afterwards transcribed them. At a subsequent interview in the prosecutor's office, before the trial, this transcription was read to the witnesses. When this was ascertained on cross-examination the defendant's counsel demanded of the district attorney the production of the transcript for the use of the defense in cross-examination. Counsel for the state offered to produce it, provided the defendant would consent that it be read in evidence in full. The defendant excepted to the conduct of the counsel in making the offer, conditioned, as it was, that the whole document should be read to the jury. The court directed the jury to disregard the offer of counsel for the state and give it no effect.

1. The defendant further objected to the refusal of the court to compel the production of the writing for the defendant's use in cross-examination. Among the contentions of the state on this point is one based on the last clause in Section 733, Or. L., reading thus:

"A public officer shall not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

Assuming, without deciding, that the conversation between the witnesses and the district attorney was

privileged, it is a privilege of the officer—in this case the one in control of the prosecution. It is within his prerogative to waive the exemption embodied in the clause quoted. In offering the whole document for the jury's consideration he waived the exemption, and, moreover, was clearly of the opinion that the public interest would not suffer by submitting the transcription to the jury. This section, therefore, must be laid out of the case.

2-4. A proper conception of the situation is essential. The court was engaged in taking evidence at the trial. If the document in question had any evidentiary value, the defendant could have compelled its production by a *subpoena duces tecum* served upon the individual having custody of it. It would seem also that Section 533, Or. L., would be applicable in a proper case to the matter in hand:

"The court or judge thereof, while an action or suit is pending, may order either party to give the other, within a specified time, an inspection and copy, or permission to take a copy, of any book, document, or paper in his possession, or under his control, containing evidence or matters relating to the merits of the action or suit, or the defense therein. * * *"

The power of the court under this section is clearly discretionary. The language is not mandatory. Moreover, the paper or document must contain evidence or matters relating to the merits of the action or suit, before the court even in its discretion can compel an inspection thereof by the adverse party. Discovery cannot be used as a mere exploring expedition. The paper here involved was not admissible as evidence in the case. The utmost that can be claimed for it is that it is a hearsay, unverified declaration of what the witnesses said in conversation

with the prosecuting officer. The only possible way that those witnesses could be affected by the conversation would be to impeach them by asking if they had made declarations on that occasion in the presence of the officer and the stenographer inconsistent with their testimony at the trial. If they denied the statement appearing in the transcript in possession of the district attorney, that paper would not be competent in itself to impeach them. They had not subscribed it, nor, so far as appears in the testimony, had they authorized its making. In order to impeach them, the stenographer or someone else who heard the statements would have to be called. The stenographer heard what the witnesses said in the interview with the prosecutor. It is plain that the attorneys for the defendant could not compel the stenographer to converse with them and inform them about what the witnesses had said in that interview. By a parity of reasoning they cannot compel the officer to furnish them a transcript of what was said.

The only case cited by the defendant in support of his contention in this matter is *People* v. *Becker,* 210 N. Y. 274 (104 N. E. 396). In that case an avowed accomplice of the defendant was called as a witness by the people. On cross-examination it was developed that he had entered into a written contract with the prosecuting officer for immunity from prosecution, provided he would testify in support of the indictment. It appears from the report of the case that he had also prepared and placed in the possession of the district attorney a written confession of his connection with the crime. He proved a reluctant witness in his statements about the terms of the contract, and there, as here, the defendant demanded an inspection of the contract and the confession, for

use in cross-examination. But the court refused at first to compel their production. Later on in the same case, while another accomplice was on the stand under cross-examination, the defendant moved the court to direct the opening of certain depositions that had been taken in Arkansas, by which he proposed to contradict the witness after having called attention to his contrary statements; but this was refused. The Becker case is not parallel with the present issue. Those depositions were original evidence in the case, while the memorandum made by the unsworn stenographer here does not come within that category. The contract for immunity signed by the witness, and his own prepared statement possibly might be contradictory of his declarations on the witness-stand and so in certain conditions could be used in evidence. The unverified notes of the stenographer in the instant case would not of themselves be contradictory of the witnesses, and if the latter were to be impeached, those who heard their contrary statements would of necessity be called to testify. The mere hearsay, unsigned, unverified transcript made by a private individual would not, of itself be competent for that purpose. This question was thoroughly examined in *State* v. *Rhoads*, 81 Ohio St. 397 (91 N. E. 186, 18 Ann. Cas. 415, 27 L. R. A. (N. S.) 558), and in an exhaustive opinion it was held that the production of such a document is not to be compelled at the instance of the defendant. As shown in the note to *Pearson* v. *Yoder*, 39 Okl. 105 (134 Pac. 421, 48 L. R. A. (N. S.) 334), reported anew in Ann. Cas 1916A, 62, much apparent confusion has arisen about the protection of privileged communications owing to the purpose for which they were demanded, but, in our judgment, the de-

fendant had no right to an inspection of the paper described in this instance, under the attendant circumstances. His right to cross-examine the witnesses for the state was not abridged. All that happened was that the court declined to compel the prosecutor to assist in that cross-examination by producing the notes of his search for evidence. In other words, the court declined to compel the prosecutor or his stenographer, or what was the same, the stenographer's transcript, to submit to an interview by the attorneys for the defendant.

5. Another view of this branch of the case may be derived from an application of Section 859, Or. L.:

"A witness is allowed to refresh his memory, respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing; but in either case the writing must be produced, and may be inspected by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury. So, also, a witness may testify from such a writing, though he retain no recollection of the particular facts; but such evidence shall be received with caution."

A similar question was involved in *State* v. *Magers,* 36 Or. 38 (58 Pac. 892). The defendant, having been arrested, was taken before the chief of the Portland police and interrogated respecting his connection with the murder of which he was afterwards accused. A stenographer present took notes of the conversation and transcribed them, leaving the transcript in the possession of the officer. Magers was afterwards indicted in Polk County. The chief of police was called there as a witness at the trial. Before going

he read over the transcript of the conversation he
had with the defendant, but did not produce it at the
trial. He said the notes were of some assistance to
him in refreshing his memory. But at the time of
the trial he had an independent recollection of the
substance of the conversation with the defendant,
and he did not use the transcript while on the witness
stand. The question was raised there in the form
of a motion to strike out the testimony of the officer
because he did not produce the memorandum which
had refreshed his memory. Speaking by Mr. Chief
Justice WOLVERTON, the court gave the matter an
extended examination, citing many authorities, among
others this excerpt from Greenleaf on Evidence, Sec-
tion 437, classifying writings of the kind in question:

"(1) Where the writing is used only for the pur-
pose of assisting the memory of the witness. In this
case it does not seem necessary that the writing
should be produced in court, though its absence may
afford matter of observation to the jury; for the wit-
ness at last testifies from his own recollection. (2)
Where the witness recollects having seen the writing
before, and, though he has now no independent recol-
lection of the facts mentioned in it, yet he remembers
that at the time he saw it he knew the contents to be
correct. In this case the writing itself must be pro-
duced in court, in order that the other party may
cross-examine; not that such writing is thereby made
evidence of itself, but that the other party may have
the benefit of the witness refreshing his memory by
every part."

The opinion sums up the discussion thus:

"The case falls clearly within the first class desig-
nated by the authorities, and, the witness not having
referred to or used the notes while undergoing ex-
amination, for the purpose of refreshing his memory,
the defendant had no right to their production in

court. It would have been otherwise if the witness, after refreshing his memory, could not have spoken from independent recollection, but could only testify that he knew the facts at the time they were written down, that they were written correctly, that he could not recall them, but that he knew them to be true as stated in the memorandum. Such a case would fall under the second class, and the defendant would then be entitled to the privilege of having the notes in court for his inspection."

In the instant case Mr. and Mrs. Libby, as witnesses, had no occasion to use the memorandum, even out of court. They seem to have retained an independent recollection of what they saw, and did not use the memorandum at all while testifying at the trial. There was no error in refusing to compel the district attorney to produce it, there being no evidentiary value to be attributed to it: *People* v. *Glaze,* 139 Cal. 154 (72 Pac. 965); *People* v. *Salsbury,* 134 Mich. 537 (96 N. W. 936); *State* v. *Jackson* (Mo. App.), 194 S. W. 1078; *Williams* v. *Duluth Street Ry.,* 169 Wis. 261 (171 N. W. 939); *Chandler* v. *State,* 60 Tex. Cr. Rep. 329 (131 S. W. 598); *C. W. Hull Co.* v. *Marquette Cement Mfg. Co.,* 208 Fed. 260 (125 C. C. A. 460).

6, 7. The next assignment of error noted in the defendant's brief is the admission in evidence of the short flight of the codefendant and his arrest and return to the place where the decedent fell. It is, indeed, an error to admit the declarations of co-conspirators made after the commission of the object of the conspiracy. A combination of individuals having been shown to exist for the accomplishment of a criminal purpose, it may be likened to a partnership wherein the declarations of any partner will bind the firm; but when the contract of partnership

is ended, the firm business wound up, and the firm dissolved, the declarations of any former partner will not bind any of those who were once associated with him in the business. It is on this analogy that the subsequent declarations of a conspirator can bind only himself and not his criminal associates. The following precedents have been cited in support of the defendant's position on this assignment of error: *Sheppard* v. *Yocum,* 10 Or. 402, 417; *Osmun* v. *Winters,* 30 Or. 177 (46 Pac. 780); *State* v. *Tice,* 30 Or. 457 (48 Pac. 367); *State* v. *Magone,* 32 Or. 206 (51 Pac. 453); *State* v. *Hinkle,* 33 Or. 93 (54 Pac. 155); *Logan* v. *United States,* 144 U. S. 263 (36 L. Ed. 429, 12 Sup. Ct. Rep. 617); *Sparf* v. *United States,* 156 U. S. 51 (39 L. Ed. 343, 15 Sup. Ct. Rep. 273, see, also, Rose's U. S. Notes). In all of these cases, without exception, the matter considered by the opinions of the court consisted of declarations of a conspirator uttered after the accomplishment of the purpose, wherein he made statements prejudicial to his associate in the crime they jointly had committed. Here no such condition occurs. During his flight and after his arrest and return to the custody of the officer, where the decedent fell, Shee Fong made no statement appearing in evidence respecting his own connection, or that of his codefendant, with the homicide. The matter was so closely connected with what had gone before that it may safely be said to be part of the *res gestae.* It became important to identify all of the participants in the homicide, in pursuance of which it was certainly admissible, although unnecessary, to be followed with great detail, to allow witnesses who saw him engaged, as they say, in the killing, to show that the comrade of the defendant was kept in their view during the pursuit and cap-

ture, so that he could be identified by them as a participant in the killing. It is akin to the principle laid down in *State* v. *Aiken,* 41 Or. 294 (69 Pac. 683), where it was held that the physical appearance of a codefendant after the homicide was admissible against the one on trial.

8. The defendant claims that he and his companion, Shee Fong, were attacked by some four or five members of an antagonistic tong, and on that basis complains that the following instruction was not given:

"If the defendant honestly believed, and the circumstances were such that a reasonably prudent man would have been led to such belief, that the life of his companion was in danger at the hands of Chin Hong or his associates, then he had the right to take such measures as were in his power to prevent the commission of such crime, even though it would lead to the death of Chin Hong."

There are several objections to this instruction. After the definition in Section 1908, Or. L., of justifiable killing when committed by public officers or those acting in their aid and assistance and by their command, Section 1909, Or. L., makes justifiable—

"The killing of a human being * * by any person * * (1) to prevent the commission of a felony upon such person or upon his or her husband, wife, parent, child, master, mistress or servant; (2) to prevent the commission of a felony upon the property of such person, or upon property in his possession, or upon or in any dwelling-house where such person may be; (3) in the attempt, by lawful ways and means, to arrest a person who has committed a felony or in the lawful attempt to suppress a riot or preserve the peace."

There is no pretense in the testimony that the defendant here was attempting to arrest the decedent or to suppress a riot, preserve the peace, or to pre-

vent a felony upon property. The instruction under
consideration leaves it solely to the defendant's dis-
cretion what to do in defense of himself and his
companion, without regard to whether it was reason-
able or in proportion to the danger real or apparent,
but to take "such measures as were in his power to
prevent the commission of such crime." It is horn-
book law that self-defense is a merely preventive
remedy, and must not be out of proportion to the
real or apparent danger. This principle is dis-
regarded in the form of the instruction presented.
Again, it is not every danger which will excuse a
homicide. It must be an imminent danger of death
or great bodily harm. The imminence of danger is
left out of the requested instruction.

In substance, the defendant requested the court
to charge that, if the decedent and those associated
with him were acting together for the purpose of
attacking the members of the rival tong, the decedent
would be bound by the acts of his associates, and
that the defendant on trial would have a right to act
on appearances and to "take such measures as were
necessary to protect himself and his companion from
such attacks, even though such measures resulted in
taking the life of Chin Hong." A similar instruc-
tion was to the effect that one who joins as a member
of a mob or crowd in an unlawful attack upon the
life of another, has no reason to complain if the
victim attacked shoots into the crowd in the pro-
tection of his own life, and kills an unarmed member
thereof; and that if the deceased was a member of
such a crowd and made an attack upon the defendant
and his companion unlawfully, wrongly, and
maliciously, the defendant and his companion would
have a right to act upon the appearance of danger

to themselves and their lives, and to defend themselves, even though they took human life.

9. The objections to these instructions are that there are no observances of the principle that the defense must not exceed the real or apparent danger of the attack, and that the peril spoken of in the requested charge does not appear to be imminent. Moreover, these instructions are not applicable to the situation described by the testimony on the part of the defendant. He avows that the only reason he pursued Chin Hong and shot him was to protect Shee Fong. In a proper case the defendant rightfully could operate under Section 1806, Or. L., declaring that—

"Resistance to the commission of a crime may be lawfully made by the party about to be injured, or by any other person in his aid or defense, * * to prevent a crime against his person. * * "

The defendant cannot justify himself under this section, however, in doing more in the defense of Shee Fong than the latter could do for himself: 5 C. J. 751; 2 R. C. L. 554. But even as to that, granting that it is true that the decedent was pursuing Shee Fong, that pursuit ended at the intersection of Glisan and Broadway Streets, where Shee Fong ran to the right and the decedent to the left of the street-car; the latter continuing his flight south on Broadway to the southwest corner of the intersection of that street with Flanders. All of the testimony shows without dispute that from the street-car on the decedent was running from the defendants and being pursued by them. It is primary learning in criminal law that self-defense cannot be turned into an instrument of vengeance or reprisal, and that when the danger has passed or ceased to be

imminent, the right to kill in resistance ceases: *State v. Erickson,* 57 Or. 262 (110 Pac. 785, 111 Pac. 17); *State v. Burton,* 18 Del. (2 Penne.) 472 (47 Atl. 619); *Hadley v. State,* 58 Ga. 309; *People v. Mullen,* 179 Ill. App. 262; *State v. Black,* 86 N. J. L. 520 (93 Atl. 91); *Marrow v. State,* 37 Tex. Cr. Rep. 330 (39 S. W. 944); *Malone v. State* (Tex. Cr. App.), 35 S. W. 991; *Yeldell v. State* (Tex. Cr. App.), 25 S. W. 424.

It may be said in passing that this doctrine as applied to this case is made to depend upon the statement of the defendant himself. Disinterested Caucasian witnesses in considerable numbers testified with one accord that the decedent was being pursued by the defendant and his companion throughout the fatal course from Sixth Street up Glisan and south on Broadway to his death, and that he was unarmed. After the melée on Sixth Street, where there were so many participants in the general discharge of firearms, there were no others concerned in the homicide of the decedent, so far as the testimony shows, except the defendant Yee Guck and his associate, Shee Fong. There is no testimony that they were pursued or attacked by any mob or crowd after leaving Sixth Street. The only dispute in the testimony is whether the decedent chased Shee Fong from Sixth Street to Broadway, or was himself pursued by Shee Fong. From there on to the scene of his death, Chin Hong was being pursued by the defendant and the latter's associate, according to Yee Guck's own story. The only concern the defendant had was his avowed purpose to kill the decedent to prevent him in turn from killing or seriously wounding Shee Fong. The instructions on that point were not applicable to the case, put in its most favorable light by the defendant himself.

Much reliance is placed upon an excerpt from the opinion of Mr. Justice WOLVERTON in *State* v. *Gibson,* 43 Or. 184 (73 Pac. 333), where, after having discoursed about the duty of a defendant to avert an attack, if he can do so without danger to himself, this language was used:

"But the doctrine has no place in criminal law where the assault is precipitated without provocation, and is of such a character as to indicate to a reasonable mind acting upon appearances that the danger to life or the infliction of great bodily harm is imminent. In such case the assailed is justifiable in killing his aggressor if necessary to avert the consequences upon himself, and need not consider on the moment whether he may avert the impending danger or avoid the taking of the life of his antagonist by retreating, or resorting to some other expedient less violent."

As has been pointed out, this instruction is not applicable to the case made by the defendant's testimony. The learned judge evidently did not intend to lay down the rule that where the decedent was in full flight, endeavoring to escape from the defendant, the latter had a right to follow him and kill him.

The court very fully instructed the jury upon the right of a defendant to act upon real or apparent danger to his life in the defense of himself, and it was not confined to the conduct merely of the decedent. On the contrary, it was said to the jury that:

"In determining whether the deceased was killed by the defendant under the reasonable apprehension of death or great bodily harm, you should consider what would be the reasonable apprehension of the defendant, Yee Guck, in the situation in which from the evidence you find him at the time of the alleged killing of Chin Hong. You should consider all the evidence relating to the position the deceased and

the defendant, their companions and other actors were in at the time of the alleged commission of the crime, the relative sizes, strength, and physical abilities of the parties, together with all of the evidence bearing upon the scene of the conflict, as you have received it in the evidence produced.''

This language clearly distinguishes the case in hand from that of *State* v. *Adler,* 146 Mo. 18 (47 S. W. 794). There the decedent was one of a crowd said to be pursuing the defendant with the apparent purpose of killing him or doing him great bodily harm. The trial court, charging the jury, confined the appearance of danger to the acts of the decedent alone, without reference to his companions acting with him, and for this error the conviction was reversed. But, as shown above, the situation indicative of danger to the instant defendant was made to depend upon the actions of all those concerned, including the decedent.

10. From the whole record we are of the opinion that the rights of the defendant were substantially preserved at the trial. Minor errors are suggested, but they are sufficiently disposed of in what has already been said. From the beginning of the present Criminal Code it has always been the rule that—

"After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties": Section 1626, Or. L.

We are convinced that the defendant had a fair trial, and the judgment must be affirmed.

AFFIRMED.

McBRIDE, BEAN and HARRIS, JJ., concur.